**Frank T. BUCKLEY, Plaintiff,**

**v.**

**AIRSHIELD CORPORATION, Fibertec Corporation, Werner Enterprises, Inc. and Washington Freightliner, Inc., Defendants.**

**Civ. A. No. AW 95–1481.**

United States District Court,
D. Maryland,
Southern Division.

Dec. 1, 1995.

Charles D. Ossola, Timothy R. DeWitt, Kenneth E. Krosin, Harrie R. Samaras, Bruce K. Lagerman, Lowe, Price, LeBlanc & Becker, Alexandria, VA, for Frank T. Buckley, Jr.

Louis J. Kozlakowski, Law Office, Baltimore, MD, Linda M. Schuett, Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, MD, Mark P. Stone, Law Office, Stanford, CT, for Airshield Corporation, Washington Freightliners, Inc.

Louis J. Kozlakowski, Law Office, Baltimore, MD, Linda M. Richards, Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, MD, Mark P. Stone, Law Office, Stanford, CT, for Fibertec Corporation, Werner Enterprises.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Frank T. Buckley ("Dr. Buckley") instituted suit against Defendants Airshield Corporation ("Airshield"), Fibertec Corporation, Werner Enterprises, Inc. and Washington Freightliner, Inc. (collectively, "Defendants"). Dr. Buckley alleges patent infringement under 35 U.S.C. § 100 *et seq.* and breach of license agreement. The Defendants deny infringement and urge that Dr. Buckley's patent is invalid, void and unenforceable.

Currently pending before the Court are Dr. Buckley's motion to disqualify Mark P. Stone as Defendants' counsel and his motion to dismiss Defendant Airshield's second counterclaim.[1] The Court conducted a hearing in open court on the record on 23 October 1995. For the reasons stated in open court and set forth more clearly below, the Court will issue an order granting Dr. Buckley's motion to disqualify Mark P. Stone as counsel and denying Dr. Buckley's motion to dis-

---

**1.** For the purpose of deciding the present motions, the Court will treat Dr. Buckley's license agreement "terminations" as valid.

miss Defendant Airshield's second counter-claim.

## I.

In early 1976, Dr. Buckley applied to the United States Patent Office for a patent directed at a "fairing" [2] device he had invented. Six weeks after he made application, on 31 March 1976, Dr. Buckley granted Rudkin–Wiley an exclusive license to manufacture, use and sell fairings which were covered under the patent applications (the "First License Agreement"). On 20 January 1981, the United States Patent Office issued Dr. Buckley patent number 4,245,862 (the "862 patent") for the fairing device.

A number of firms began copying Dr. Buckley's patented fairing device and, as a result, Rudkin–Wiley sued for patent infringement (the "1985 patent infringement actions"). Rudkin–Wiley sued, among others, International Harvester Company (later called "Navistar") on 22 October 1985 (the "Navistar action"); Fiber Tech on 31 October 1985 (the "Fiber Tech action"); and Pulse Inc. and Fab–Glas Industries, Inc. on 15 November 1995 (the "Pulse action"). In December 1985, as a result of the patent infringement actions, Dr. Buckley and Rudkin–Wiley entered into a "Litigation Agreement." Under this agreement Dr. Buckley, as owner of the '862 patent, agreed to join Rudkin–Wiley as a co-plaintiff in the Fiber Tech, Navistar and Pulse actions. Thereafter, Rudkin–Wiley filed amended complaints adding Dr. Buckley as a co-plaintiff.

The Law Office of Eugene Davis initially represented Rudkin–Wiley and Dr. Buckley in the 1985 patent infringement actions. Mark Stone worked for Mr. Davis as a patent attorney and assisted Mr. Davis with the 1985 patent infringement actions. Mr. Stone was also listed as "Of Counsel" in the Fiber Tech and Navistar actions.

According to Mr. Davis, Mr. Stone billed approximately 795.25 hours on matters related to Dr. Buckley's patent and the 1985

patent infringement actions, with only 12.25 of which were related to the license agreement. He states that Mr. Stone had unlimited access to all files in the office and frequently consulted files related to Dr. Buckley's patent throughout his employment period.[3]

Mr. Stone posits that when he worked for Mr. Davis, his work on the matters related to Dr. Buckley's patent and the 1985 patent infringement actions was limited. He and Mr. David R. Biondi, Rudkin–Wiley's former general counsel, declare that Mr. Davis almost exclusively handled the 1985 patent infringement actions and related matters. Mr. Stone states that he never entered an appearance on behalf of Rudkin–Wiley; never consulted with Rudkin–Wiley; never attended a deposition; never made any court appearances; never attended trial; and was never involved in settlement activities. According to Mr. Stone, his involvement was limited to updating legal research and preparing memoranda of law in the litigation, which he did until September 1987 when Rudkin–Wiley transferred the 1985 patent infringement actions to William J. Speranza of the firm St. Onge, Steward, Johnston & Reen, LLC.

Mr. Speranza received and reviewed the files. He recalls that among the files were some boxes identified as Dr. Buckley's personal files. He also posits that according to his review of the files, Mr. Stone was substantively involved in the 1985 patent infringement actions.

On 6 September 1988, Dr. Buckley terminated the First License Agreement with Rudkin–Wiley. Thereafter, the parties renegotiated and executed a new license agreement on 30 November 1988. Mr. Biondi represented Rudkin–Wiley. Mr. Kenneth E. Krosin represented Dr. Buckley during this and all subsequent negotiations involving the license agreement with Rudkin–Wiley. In October 1988, Mr. Krosin had two conversations with Mr. Stone regarding the coverage

---

**2.** The fairing is a device mounted to the roof of a tractor-trailer cab for reducing aerodynamic drag on the vehicle.

**3.** Mr. Stone worked for Mr. Davis from March 1985 until June 1988. However, the relationship ended on less than amicable terms. Mr. Stone ultimately sued Mr. Davis for unpaid wages and received a judgment against him.

of the '862 patent, however, Mr. Stone was not otherwise involved in these negotiations.

Dr. Buckley terminated his 30 November 1988 license agreement on 27 July 1989 and the parties executed a new license agreement on 14 August 1989 (the "Second License Agreement"). Mr. Biondi again represented Rudkin–Wiley. Thereafter, Airshield acquired Rudkin–Wiley and on 18 August 1989, Dr. Buckley assigned the license agreement from Rudkin–Wiley to Airshield. During the negotiations, Mr. Biondi and William Ostrander of the firm Gowling, Strathy & Henderson represented Airshield. Again, Mr. Krosin represented Dr. Buckley.

On 20 August 1991, Dr. Buckley terminated the Second License Agreement with Airshield. Two days later, on 22 August 1991, Mr. Krosin heard from Mr. Stone for the first time since their October 1988 conversations. Mr. Stone wrote to Mr. Krosin advising him that he was an attorney for Airshield. In fact, Mr. Stone had acted as an attorney for Rudkin–Wiley and, subsequently, Airshield, since 1989. Yet, according to Dr. Buckley, he had no knowledge that Mr. Stone had been acting as Airshield's attorney.

From 22 August 1991 until 17 May 1995 when Buckley filed the instant action, the parties engaged in, among others, the following communications:

22 August 1991  Introductory letter from Stone to Krosin demanding that Dr. Buckley cease contacts with Airshield's customers;

29 August 1991  Response letter from Krosin to Stone;

30 August 1991  Letter from Stone to Krosin further complaining about Dr. Buckley's contacts with Airshield's customers;

04 September 1991  Response letter from Krosin to Stone;

10 September 1991  Letter from Krosin to Stone, with copy sent to Dr. Buckley, requesting quarterly reports for "Covered Fairing" under license agreement;

02 October 1991  Letter from Stone to Krosin in response to 09/10/91 letter;

08 October 1991  Letter from Krosin to Stone, with copy sent to Dr. Buckley, advising Stone of Airshield's obligation to pay Dr. Buckley option royalties through the 08/20/91 license termination date;

09 October 1991  Letter from Stone to Krosin discussing "Option Royalty" provision of license agreement, disputing amount Dr. Buckley alleged to be due and advising of product modification;

12 November 1991  Settlement meeting between Airshield and Dr. Buckley, Stone was not present;

24 January 1992  Letter from Stone to Krosin regarding maintenance fees for Australian patents;

24 January 1992  Letter from Stone to Krosin responding to 13 January 1992 letter from Dr. Buckley to Erwin of Airshield regarding Dr. Buckley's request for dimensional data concerning certain of Airshield's products;

17 September 1992  Letter from Krosin to Mr. Jay Cowen, Director of Purchasing, Freightliner Corporation, advising Cowen that Freightliner was infringing Dr. Buckley's fairing patent;

08 October 1992  Letter from Stone to Krosin regarding Krosin's letter to Cowen and requesting Krosin to specifically identify alleged infringing fairings;

01 December 1992  Letter from John D. Vandenberg, Esq., of Klarquist, Sparkman, Campbell, Leigh & Whinston, to Krosin, with copy sent to Stone, responding to Krosin's 17 September 1992 letter, advising they represent Freightliner and requesting additional information;

30 September 1993  Letter from Krosin to Stone summarizing matters related to Dr. Buckley's 20 August 1991 termination of Airshield's right to use his patent;

14 October 1993  Letter from Krosin to Stone regarding telephone conversation of previous week and requesting that Stone report to Airshield that Dr. Buckley "maintains his positions both with respect to Airshield's breach of the license agreement prior to August 20, 1991, and infringement of his patent

since that date" and expressing interest in settlement;

14 October 1993 Letter from Krosin to Chris Edwardsen, Freightliner Corporation, referring to letter to Cowen, urging Freightliner to reassess its potential liability and advising that he would send a letter to Vandenberg to broadly explain how he would establish patent infringement;

14 October 1993 Letter from Krosin to Vandenberg explaining how products infringe Dr. Buckley's patent.

Dr. Buckley and Airshield also communicated with one another in an attempt to settle their differences regarding the Second License Agreement. From 14 November 1991 until 25 February 1992, Airshield and Dr. Buckley exchanged nine letters. According to Dr. Buckley, Mr. Stone's name did not appear on any correspondence between Dr. Buckley and Airshield and neither Stone nor Krosin participated in these negotiations. Unable to reach a settlement directly with Airshield, on 31 January 1994, Dr. Buckley and Mr. Krosin met with Mr. Stone and Mr. Kaftel of Airshield in one final attempt to resolve the dispute short of litigation. The meeting was not successful.

When it became clear that the parties would not settle, Dr. Buckley and Mr. Krosin informed Airshield and Mr. Stone of Dr. Buckley's intention to sue Airshield for both breach of the Second License Agreement and for infringement of the '862 patent for sales of infringing products made after the agreement was terminated on 20 August 1991. Contemporaneously, Mr. Krosin informed Mr. Stone that his participation in the legal action would constitute a conflict of interest as he had previously represented Dr. Buckley.

On 17 May 1995, Dr. Buckley filed this action alleging patent infringement and breach of the Second License Agreement. On 22 June 1995, the Court granted Defendants' motion for Mr. Stone to appear *pro hac vice*. On 17 July 1995, Dr. Buckley moved to disqualify Mr. Stone as Defendants'

counsel. Airshield filed its answer and a counterclaim ("second counterclaim") arising from its and its predecessor's, Rudkin–Wiley, dealings with Dr. Buckley. Dr. Buckley then moved for dismissal of Airshield's second counterclaim because it relates to the First License Agreement.

Having thoroughly read the memoranda and listened to oral argument thereupon, the Court is now ready to dispose of these matters. For the reasons set forth more fully below and in open court, the Court will grant Dr. Buckley's motion to disqualify Mr. Stone as Defendant's counsel and will deny Dr. Buckley's motion to dismiss Airshield's second counterclaim.

## II.

Dr. Buckley urges that Rule 1.9(a) & (b) of the Maryland Rules of Professional Conduct prohibits Mr. Stone's representation of the Defendants.[4] He contends that because Mr. Stone worked as an attorney on the 1985 patent infringement actions in which Dr. Buckley was a co-plaintiff, the Court should disqualify Mr. Stone from representing Defendants. He posits that during the prior representation, Mr. Stone received confidential information. Dr. Buckley urges that because this action is substantially related to the 1985 patent infringement actions, Mr. Stone will necessarily use the confidential information to Dr. Buckley's disadvantage.

Mr. Stone counters that Dr. Buckley knew early on about the conflict; that he received no confidential information; and, that Dr. Buckley filed the disqualification motion in order to gain a tactical advantage. Mr. Stone further contends that Dr. Buckley waived his right to contest Mr. Stone's representation of the Defendants. He urges that Dr. Buckley's six year delay, since 1989, in raising the conflict of interest issue is inexcusable.

## III.

▮▮▮ One of the Court's duties and responsibilities is to ensure that attorneys who

---

4. The same ethical rules adopted by the Maryland Court of appeals and governing the conduct of state practitioners apply to and are imposed

upon federal practitioners. *See* Local Rule 704 (D.Md.1995).

**304**

appear before it preserve the public's confidence in the judicial system. *Tessier v. Plastic Surgery Specialists, Inc.,* 731 F.Supp. 724, 729 (E.D.Va.1990) (citations omitted). Yet, "[t]here must be a balance between the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community." *Id.* (citing *In re Asbestos Cases,* 514 F.Supp. 914 (E.D.Va.1981)). Thus, when the Court must make a disqualification determination upon difficult facts, it does not

> weigh the circumstances with hair splitting-nicety but, in the proper exercise of supervisory power over the members of the bar and with a view of preventing the appearance of impropriety, it is to resolve all doubts in favor of disqualification.

*United States v. Clarkson,* 567 F.2d 270, 273 n. 3 (4th Cir.1977) (internal quotation marks and citations omitted); *Rogers v. Pittston Co.,* 800 F.Supp. 350, 353 (W.D.Va.1992), *aff'd,* 996 F.2d 1212 (4th Cir.1993); *Tessier,* 731 F.Supp. at 729 (right to obtain counsel of one's own choosing is of secondary importance) (citation omitted); *Stitz v. Bethlehem Steel Corp.,* 650 F.Supp. 914, 916 (D.Md. 1987).

■ Recognizing that disqualification is a drastic measure, courts must "avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel." *Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142, 146 (4th Cir.1992), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992) (citation omitted); *Gaumer v. McDaniel,* 811 F.Supp. 1113, 1117 (D.Md.1991); *Rogers,* 800 F.Supp. at 353 (W.D.Va.1992). Rather, a court should decide disqualification motions on a case-by-case analysis. *Rogers,* 800 F.Supp. at 353.

Since disqualification is such a drastic measure, Dr. Buckley "bears a high standard of proof to show that disqualification is warranted." *Tessier,* 731 F.Supp. at 729 (internal quotation marks and citations omitted). "The high standard of proof is fitting in light of the party's right to freely choose counsel and the consequent loss of time and money

incurred in being compelled to retain new counsel." *Id.* Yet, the Court must be mindful of its obligation to the public and to upholding integrity in the judicial system. *Tessier,* 731 F.Supp. at 724. With these guidelines and principles in mind that the Court begins its analysis under Rule 1.9.[5]

### A.

Rule 1.9, "Conflict of Interest; Former Client", provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter:

> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

> (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

The Maryland Lawyers' Rules of Professional Conduct Rule 1.9 (Michie 1995) (hereinafter "Rule 1.9"). While Maryland case law interpreting Rule 1.9 is sparse, the clear language of the rule requires Dr. Buckley to show that a substantial relationship exists between this matter and prior matters in which Mr. Stone acted as Dr. Buckley's attorney or that Mr. Stone will use information gained in the prior representation to Dr. Buckley's disadvantage. *See Gaumer,* 811 F.Supp. at 1117 (citations omitted).

### B.

■ In order to show a substantial relationship, "it is not necessary that two lawsuits involve the same operative facts, so long as there is a sufficient similarity of issue". *Avnet, Inc. v. OEC Corp.,* 498 F.Supp. 818, 820 (N.D.Ga.1980); *see also Blumenthal Power Co. v. Browning–Ferris, Inc.,* 903 F.Supp. 901 (D.Md.1995). The Court must, therefore, examine the nature and scope of the prior and present representation and de-

---

5. The Court has not located any cases in Maryland which address Rule 1.9 in depth. However, many other jurisdictions use the same language

and the Court will, therefore, rely on their analysis.

termine whether confidences might have been disclosed in the course of the prior representation which could be relevant to the present action.[6] *See Commonwealth Insurance Company v. Graphix Hot Line,* 808 F.Supp. 1200, 1204 (E.D.Pa.1992).

Rudkin–Wiley, now Airshield, initiated actions against several defendants alleging patent infringement and, in some instances, unfair competition. Mr. Stone acted as of counsel for Airshield and, at times, as a primary researcher for Mr. Davis as Airshield pursued its claims that (1) Dr. Buckley's '862 patent was valid; (2) Airshield was the exclusive licensee; and, (3) the defendants were infringing the patent and misleading consumers. In these prior actions against Navistar, Fibertec and Fab–Glas, Mr. Stone assisted Airshield as it defended against claims that Dr. Buckley's '862 patent was invalid, void and unenforceable because it did not meet the conditions of patentability.

In this action, Dr. Buckley alleges patent infringement and breach of license agreement. In their answers, the Defendants, Fibertec being among them, allege that Dr. Buckley's '862 patent is invalid, void and unenforceable because it does not meet the conditions of patentability. Specifically, the Defendants accuse Dr. Buckley of failing to comply with 35 U.S.C. §§ 102, 103 and 112. They claim that because Dr. Buckley misused his patent it is unenforceable. Airshield also accuses Dr. Buckley of unfair competition and vigorously argues that Dr. Buckley's patent is invalid because of prior art.

Airshield asserts that its current position in this action is not inconsistent with the position taken by Rudkin–Wiley in the 1985 patent infringement actions. According to Airshield, after commencing the 1985 patent infringement actions, it modified the products it currently manufactures and sells for the express purpose of avoiding Dr. Buckley's patent. Thus, Airshield urges that its present position is not inconsistent to the position it took in the 1985 patent infringe-ment actions. Rather, Airshield urges that its position has changed as a result of subsequently acquired information.

The Court concludes that the prior actions are substantially related to the case at hand. Even assuming, *arguendo,* that Airshield is correct, its argument only supports the Court's conclusion that the 1985 patent infringement actions are substantially related to the present litigation. At the core of each action is the challenge to the validity of Dr. Buckley's '862 patent. The fact that Airshield now challenges the validity of Dr. Buckley's '862 patent using the very information it received from parties it once sued to protect Dr. Buckley's patent strongly suggests that these matters are substantially related.[7] *See Blumenthal Power Co. v. Browning–Ferris, Inc.,* 903 F.Supp. 901 (D.Md.1995) (" 'substantially is present if the factual contexts of the two representations are similar or related' ") (quoting *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 501 F.Supp. 326, 328–29 (D.D.C.1980); *Avnet, Inc.,* 498 F.Supp. at 820 ("a sufficient similarity of issue" is enough to show substantial relationship).

The Court is not convinced by Mr. Stone's contention that the time he worked on matters related to Dr. Buckley's patent was limited. Even assuming Mr. Stone "billed only a short period of time [it] does not preclude [his] work from being substantially related to the present litigation." *Elan Transdermal Ltd. v. Cygnus Therapeutic Systems,* 809 F.Supp. 1383, 1388 (N.D.Cal.1992) (citations omitted); *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 189 (7th Cir.1979) ("transformation of the substantial relationship test to merely a mathematical evaluation cannot be permitted").

Nor is the Court convinced by Mr. Stone's argument that he never entered an appearance on behalf of Rudkin–Wiley; never con-

---

**6.** Mr. Stone bore the obligation of informing Dr. Buckley that he represented Airshield but neglected to do so for three years. It is undisputed that he did not consult with Dr. Buckley or receive Dr. Buckley's consent to represent Airshield. The fact that Dr. Buckley voluntarily entered the prior lawsuits as a co-plaintiff in no way diminished this obligation.

**7.** The Court notes that one of these parties, Fibertec, is now also represented by Mr. Stone.

sulted with Rudkin–Wiley; never attended a deposition; never made any court appearances; never attended trial; and was never involved in settlement activities. An attorney-client relationship existed between Mr. Stone and Dr. Buckley and this argument does nothing to compel the Court otherwise. *See Kabi Pharmacia AB v. Alcon Surgical, Inc.,* 803 F.Supp. 957 (D.Del.1992). The Court's focus must properly be on the litigation issues in the prior and present action. Under this analysis, the two are substantially related.

### C.

■ Mr. Stone argues that even if the prior and present action are substantially related he should not be disqualified because he received no confidential information. Courts have held that "[i]n determining whether the two cases are 'substantially related,' the court must decide whether the attorney could reasonably have been exposed to client confidences in the former case." *Rogers,* 800 F.Supp. at 353. However, Mr. Stone's argument lacks merit inasmuch as "[i]t is well settled that once an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter." *Tessier,* 731 F.Supp. at 724 (citations omitted); *see also T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953).

It is undisputed that Mr. Stone was of counsel in cases in which Airshield and Dr. Buckley were both plaintiffs. Moreover, both Dr. Buckley and Mr. Speranza allege that Dr. Buckley provided confidential information from his own personal files to assist Airshield in the Navistar, Fibertec and Pulse actions. When Mr. Speranza became Airshield's patent attorney, he requested Airshield's files from then Mr. Stone's employer, Mr. Davis. Among the files were boxes labelled "Dr. Buckley's personal files."

It is undisputed that while Mr. Stone worked for Mr. Davis he had unlimited access to all of Airshield's files. It is further undisputed that Mr. Stone assisted Mr. Davis with Airshield matters regarding Dr. Buckley's patent. While Mr. Stone disputes the number of hours he billed toward that endeavor, in a small office like Mr. Davis' it is not hard for the Court to believe that Mr. Stone's research required him to become familiar with Dr. Buckley's confidential patent files.

Mr. Stone unreasonably urges Dr. Buckley to inform him of what confidential information Mr. Stone received. Yet, "[n]o actual receipt of confidences must be shown; such a standard would place an unreasonable burden on the moving party." *Rogers,* 800 F.Supp. at 354. The Court is concerned with possibility rather than actuality.

Mr. Stone's contention that information about Dr. Buckley's patent is a matter of public record is equally without merit.

> [T]he client's privilege in confidential information disclosed to his attorney is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources.

*Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 573 (2d Cir.1973) (internal quotation marks and citations omitted). Moreover, Dr. Buckley asserts that much of the information regarding the '862 patent remains confidential as a part of his own personal files.

Mr. Stone argues that Mr. Davis almost exclusively handled the '862 patent matters. He, again, focuses on the time issue. Yet, again, the Court is not persuaded. "A confidence can be revealed on a related subject matter in a brief moment and without the client being charged a nickel." *Novo Terapeutisk Laboratorium A/S,* 607 F.2d at 189. While the Court is not sure of the amount of time Mr. Stone worked on the '862 patent matters, it is sure that the hours were not insignificant as Mr. Stone continued to work for Rudkin–Wiley and then Airshield even after his acrid separation from Mr. Davis.

There is a strong likelihood that Mr. Stone received confidences during his prior representation of Dr. Buckley. The Court opines that Mr. Stone may inadvertently use such confidences in this present action to Dr.

Buckley's detriment. *See Gaumer*, 811 F.Supp. at 1118. Since there has been no consultation or consent, Mr. Stone must be disqualified absent a showing that Dr. Buckley has waived his right to object.

#### D.

■ Mr. Stone posits that Dr. Buckley has waived his right to contest Mr. Stone's representation of Defendants. He urges that because of Dr. Buckley's delay in making an objection, the Court should see that the motion is purely strategical. Dr. Buckley urges that he did not delay in filing the motion once he instituted this action. Dr. Buckley further argues that once it became clear that the parties would not settle, he raised an objection to Mr. Stone.

The Court must be ever "mindful of the opposing possibility of misuse of disqualification motions for strategic reasons." *Shaffer*, 966 F.2d at 146. In determining whether a party has brought a motion to disqualify with improper motives, the timing of the motion becomes an important factor. Courts have held that a party's failure to timely raise a motion to disqualify may result in a waiver. *See Cox v. American Cast Iron Pipe Company*, 847 F.2d 725, 729 (11th Cir.1988) (party may not delay filing motion to disqualify for strategic purposes) (citations omitted); *Chemical Waste Management, Inc. v. Sims*, 875 F.Supp. 501, 504–05 (N.D.Ill.1995) (waiver is valid basis for denial when moving party knowingly refrains from timely asserting motion to disqualify). Delay is certainly an important factor. Yet, the mere length of delay is not dispositive and the Court should not deny a motion to disqualify based on delay alone. *See Kevlik v. Goldstein*, 724 F.2d 844, 848 (1st Cir.1984) (generally, "the need for upholding high ethical standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion"); *British Airways, PLC v. Port Authority of New York and New Jersey*, 862 F.Supp. 889, 901 (E.D.N.Y.1994) (" 'the Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant' ") (quoting *Emle Indus., Inc.*,

478 F.2d at 572); *Employers Ins. of Wausau v. Albert D. Seeno Construction Co.*, 692 F.Supp. 1150, 1165 (N.D.Cal.1988).

In *Wausau*, the court looked beyond the mere length of delay to consider factors that might have precipitated the delay. The *Wausau* Court considered such factors as when the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and, in particular, whether the motion was delayed for tactical reasons; and whether disqualification would result in prejudice to the nonmoving party. *Wausau*, 692 F.Supp. at 1165 (citing *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir.1983). The *Wausau* analysis addresses the two primary functions for timely serving a motion to disqualify: curbing the potential of abuse of disqualification motions as a harassing or strategical tactic and reducing the detrimental effects to the opposing party. *See Healy v. Axelrod Const. Co. Pension Plan*, 155 F.R.D. 615, 622 (N.D.Ill.1994) (citing *Commonwealth Ins. Co.*, 808 F.Supp. at 1208; *Warpar Mfg. Corp. v. Ashland Oil, Inc.*, 606 F.Supp. 852, 858 (N.D.Ohio 1984)).

Turning to the case at hand, the Court has carefully examined the parties' posture preceding the filing of the disqualification motion. Unlike Mr. Stone, the Court finds that Dr. Buckley's delay is not inexcusable. Although Dr. Buckley's attorney contacted Mr. Stone in 1988 to discuss the coverage of the '862 patent, he had no other tangible contact with Mr. Stone until 1991. With exception to the communications beginning in 1991, the pleadings suggest that Dr. Buckley had no reason to believe that Mr. Stone was an attorney for Airshield. During each of the three occasions when Dr. Buckley terminated and renegotiated his license agreements, Mr. Biondi represented Rudkin–Wiley's interest. When Airshield acquired Rudkin–Wiley, Mr. Biondi and Mr. Ostrander represented Airshield's interest in assigning Dr. Buckley's Second License Agreement from Rudkin–Wiley to Airshield. Indeed, in a 1988 letter, Airshield acknowledged Mr. Biondi as its attorney. *See* Paper No. 26, Exh. C. Dr. Buckley did not know

about Mr. Stone's representation of Airshield until 22 August 1991.

In the latter part of August 1991, Dr. Buckley began negotiating directly with Airshield about the Second License Agreement. Neither Mr. Stone nor Mr. Krosin took part in the negotiations. Other communications between Mr. Stone and Mr. Krosin, of which Dr. Buckley was aware, included complaints about Dr. Buckley's communications with Airshield customers, disputes about royalties and requests for information. Finally, in a January 1994 meeting with Mr. Stone and Mr. Krosin present, the parties acknowledged the unlikelihood of settlement. At the conclusion of the meeting, Mr. Krosin told Mr. Stone that Dr. Buckley intended to file the current action and noted that Mr. Stone's continued representation of Airshield would present a conflict of interest. Under these circumstances, the Court cannot say that Dr. Buckley waived his right to object to Mr. Stone's representation of the Defendants.

"A finding of waiver is justified ... when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity." *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1115 (D.N.J.1993) (quoting *Commonwealth Ins. Co.*, 808 F.Supp. at 1208). Dr. Buckley raised an objection within two months of filing suit and within one month of Mr. Stone's entry of appearance in this case. No trial has been set and no discovery has taken place. Moreover, the Court knows of no cases, and the parties have provided none, wherein a party waived his right to object to counsel because he failed to do so prior to filing suit.[8] Here, all communications to which Mr. Stone directs the Court's attention occurred before Dr. Buckley ever filed suit. While the Court acknowledges that Dr. Buckley or his counsel should have raised the ethical issue to Mr. Stone prior to January 1994, the Court does not find this dispositive

in light of the types of communications and the negotiation mode of the parties.

Moreover, Dr. Buckley filed the motion for disqualification near the inception of this suit. Nothing in the record suggests that it is a purely tactical device. *See Alexander*, 822 F.Supp. at 1119 (motion filed three years after filing lawsuit and four months prior to trial); *Commonwealth Ins. Co.*, 808 F.Supp. at 1209 (motion filed more than two years after filing of complaint and three weeks prior to trial); *Wausau*, 692 F.Supp. at 1166 (motion filed more than one year after filing of complaint and after attorney had done an extensive amount of work in the case). No extensive work has taken place in this case. Indeed, Dr. Buckley stands to be more prejudiced by a potential delay than Airshield. For Dr. Buckley will continue to go without the royalties to which he makes claim and his patent faces an uncertain demise.

Again, delay is a factor. Yet, there are no specific rules governing challenges based on timeliness. This Court will not avoid its "duty and responsibility of supervising the conduct of attorneys who appear before it" solely because a party delayed in raising the disqualification issue. *Tessier*, 731 F.Supp. at 729 (citations omitted). This principle is especially applicable where, as here, the disqualification motion was filed well before the commencement of trial and nothing in the record suggests Dr. Buckley filed it for purely tactical purposes. *See Emle Indus., Inc.*, 478 F.2d at 572.

## E.

The Court is satisfied that Dr. Buckley has met his burden of proof and that Mr. Stone should be disqualified. While disqualification is a harsh result,

> the right of one to retain counsel of his choosing is secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar.

---

8. The *Wausau* Court discussed the parties' knowledge of a conflict prior to the commencement of the lawsuit but in the *Cumis* context. *Wausau*, 692 F.Supp. at 1152 (citing *San Diego Navy Federal Credit Union v. Cumis Ins. Society* *Inc.*, 162 Cal.App.3d 358, 208 Cal.Rptr. 494 (4th Dist.1984) (insured has right to select independent counsel paid for by insurer where an actual or potential conflict has arisen between insured and insurer)).

*Tessier,* 731 F.Supp. at 729 (internal quotation marks and citation omitted). Avoiding a conflict and the appearance of impropriety are the best solutions.

> Chief among the reasons for avoiding conflicts of interest is the preservation of the public's confidence in the integrity of lawyers and the judicial system. To allow a conflict to remain unaddressed until an affected party complains about the quality of justice he or she has received is to betray the public trust granted to the bar as a self-regulating organization.

*Id.* Thus, the Court will issue an order granting Dr. Buckley's motion to disqualify Mr. Stone as Defendant's attorney.

### IV.

■ In its Second Counterclaim, Airshield seeks the return of royalties that it or its predecessor, Rudkin–Wiley, erroneously paid to Dr. Buckley. There is no dispute that Airshield seeks recoupment, "i.e., the setting off against asserted liability of a counterclaim arising out of the same transaction." *Reiter v. Cooper,* 507 U.S. 258, 264, 113 S.Ct. 1213, 1218, 122 L.Ed.2d 604 (1993). "Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely." *Id.* (citing *Bull v. United States,* 295 U.S. 247, 262, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935); 3 J. Moore, B. Ward, & J. Lucas, Moore's Federal Practice ¶ 13.11 (1992)).

Dr. Buckley argues that the Court should dismiss the second counterclaim as it does not relate to his complaint. Particularly, Dr. Buckley urges that his complaint only sets forth claims arising out the Second License Agreement as opposed to any claims arising out of his First License Agreement with Rudkin–Wiley. Airshield urges that the two Agreements are intricately interwoven and that the two Agreements constitute one transaction. The Court opines that the relationship between Airshield's second counterclaim and Dr. Buckley's complaint are not sufficiently clear and it will deny Dr. Buckley's motion at this time. However, Dr. Buckley may file another motion to dismiss Airshield's second counterclaim if necessary and after sufficient development of the facts.

### V.

For the reasons set forth above and in open Court on the record, the Court will issue an order granting Dr. Buckley's motion to disqualify Mark P. Stone as Defendants' counsel and denying Dr. Buckley's motion to dismiss second counterclaim. It will be so ordered.

### *ORDER*

For the reasons set forth above and in open Court on the record IT IS this 1st day of December, 1995, by the United States District Court for the District of Maryland, Southern Division, hereby **ORDERED:**

1. That Plaintiff's motion to disqualify Mark P. Stone as Defendants' Counsel BE, and the same hereby IS, **GRANTED:**

a. Defendants shall have thirty (30) days from the date of this Order to obtain new counsel and have that counsel file a notice of appearance with this Court;

2. That Plaintiff's motion to dismiss Defendants' second counterclaim BE, and the same hereby IS, **DENIED;**

3. That the Clerk of the Court mail a copy of this Order and attached Memorandum Opinion to all parties of record.